# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3367

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Jeremy Ray Hall, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: February 14, 2007
Filed: August 15, 2007

_____

Before RILEY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Jeremy Ray Hall was charged in a four-count indictment alleging drug and gun crimes. Hall moved to suppress evidence seized during an inventory search of his vehicle. The district court[1] denied Hall's motion, adopting the report and recommendation of the magistrate judge.[2] Thereafter, Hall entered a conditional plea

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

[2]The Honorable John A. Jarvey, Magistrate Judge, United States District Court for the Northern District of Iowa, now United States District Judge for the Southern District of Iowa.

of guilty to manufacturing and attempting to manufacture five grams or more of methamphetamine after a prior felony drug conviction, and possessing a firearm as a felon. Having reserved his right to appeal, Hall now does so, arguing that the district court erred in denying his motion to suppress evidence. We affirm.

I.    Background

On August 18, 2003, at approximately 1:30 a.m., the Cedar Rapids Police Department ("CRPD") received a call about a possible sexual assault victim at St. Luke's Hospital ("the Hospital"). In response, CRPD Officer Thai Nguyen went to the hospital and interviewed the alleged victim. The alleged victim told Officer Nguyen that Hall and another man sexually assaulted her, that they were involved in the manufacture of methamphetamine, and that they had outstanding warrants. She also told officers that Hall had sold her methamphetamine and that there may be items associated with the manufacture of methamphetamine in Hall's vehicle.

Around 2:30 a.m., shortly after Officer Nguyen left the Hospital, dispatch notified him that the suspects in the alleged sexual assault had arrived at the Hospital. Officer Nguyen returned to the Hospital. CRPD Officers Jeffrey Herbert and Cody Estling were already there. As Officer Estling was approaching the emergency room doors, Hospital security identified the two suspects and another man exiting the emergency room doors as the possible suspects. Officer Estling stopped the three men and asked for identification. Two of the men verbally identified themselves, and one produced a non driver's identification card. Hall initially provided Officer Estling with a false name. Officer Nguyen then approached the group, and told Officer Estling that Hall may be providing a false name. When asked by Officer Estling whether the information he had given was correct, Hall stated, "maybe you should try running 'Jeremy Hall.'" After running Hall's real name, Officer Estling discovered that there was an outstanding warrant for Hall for a probation violation. Hall was

placed under arrest at the exit of the emergency room around 2:45 a.m., and transported to the police station.

At some point before Hall was transported to the police station, officers learned that Hall's vehicle was parked on the first floor of the Hospital's private parking lot. There was a sign in the parking ramp indicating that it was a private parking ramp for the use of the Hospital's patients and guests only. When officers asked Hall for permission to search his car, Hall refused. Hall did not ask either of the two men who had accompanied him to the hospital to move his car from the ramp, nor did either of the men offer to take possession of the vehicle for him. One of the individuals had produced a non driver identification card, possibly indicating that he did not have a valid driver's license.

Officer Herbert found Hall's car in the Hospital parking lot, and he stood watch over it. According to Officer Estling's testimony at the suppression hearing, the vehicle was being secured because of reports by the alleged victim that the vehicle may contain items associated with the manufacture of methamphetamine. During this time, Officer Herbert was waiting for further directions from investigators, detectives, or commanders. There was no one in or around Hall's car while the officers were securing it. Eventually, Officer Rob Kasper relieved Officer Herbert, and Officer Herbert left the scene.

Officer Kasper was standing near Hall's vehicle when members of the Hospital's security team approached him and asked him why he was there. Officer Kasper told the security officers that the vehicle was possibly connected to a methamphetamine lab, and that its owner was not present and appeared to have left the vehicle in the ramp. Officer Kasper testified that the Hospital had previously been notified that Hall had been arrested.

The security officers then asked Officer Kasper to tow Hall's car from the Hospital's private parking lot. Officer Kasper testified that although he knew Hall was at the police station and there was a warrant out for his arrest, he had no contact with Hall, did not know if the warrant had been confirmed, and at the time the Hospital asked to have the vehicle towed, he could not conclude that Hall was under arrest simply because Hall was at the police station. Officer Kasper also testified that Officer Herbert had not informed him that Hall was under arrest. Accordingly, Officer Kasper treated the tow as a private property tow request.

The CRPD has a policy regarding the towing and/or impounding of vehicles ("the Policy"). The Policy includes procedures related to private property towing. In relevant part, the Policy provides:

> f.   Vehicles towed from private property upon the property owner's request requires the following:
>
>   1.   The lot must be posted with proper signs at each entrance or posted so signs can be seen from anywhere in the lot stating "Private Property-Unauthorized Vehicles Will Be Towed." (Signs must have been posted for at least 24 hours before we will enforce)
>   2.   A Vehicle Removal or Impounding Report (CRPD 328) will be filled out with the property owner or person in charge filling out and signing Part 2.
>   3.   A parking ticket will be issued.
>   4.   A wrecker from the towing company which has the city contract will be used to tow this vehicle.

The Policy also states that "[a]ny officer causing a vehicle to be towed, removed, or impounded will inventory the contents and record the inventory in the appropriate space on the VEHICLE REMOVAL OR IMPOUNDING REPORT." Further, the Policy provides that:

1. A visual inventory will be taken when the vehicle is locked and no keys are available. This will include such items as tape decks, speakers, tools, and clothing.
2. An inventory of all accessible areas will be taken when the vehicle is unlocked and no keys are available. This will include the area under the seats and the glove compartment.
3. A complete inventory, to include the trunk, will be taken when the keys are available.

 . . .

When an officer makes an inventory in accordance with procedures outlined in 1. and 2. above, and then finds it necessary to obtain a search warrant, any additional items found will be recorded on a separate sheet and attached to the record room copy of the VEHICLE REMOVAL OR IMPOUNDING REPORT containing the initial vehicle inventory.

Pursuant to the Policy, Officer Kasper called for a tow truck to come pick up Hall's vehicle. The vehicle was to be towed, but not impounded. Officer Kasper then conducted an inventory search of the vehicle. Officer Kasper testified that, as is his routine, he started on the outside of the vehicle, noting any exterior damage. He moved to the interior of the vehicle, starting with the driver's side, then moving to the front passenger compartments, and then to the rear passenger compartments. Officer Kasper testified that he did not find anything illegal in the interior of the car. Because the keys were available, Officer Kasper also inventoried the contents of the trunk. In the trunk, Officer Kasper found parts of firearms and several blister packs of pseudoephedrine. Once he found the methamphetamine-related items, Officer Kasper notified CRPD and requested backup from the Detective Bureau.

Around 6:00 a.m., detectives George Aboud and Anthony Robinson, who had earlier interviewed both the alleged victim of sexual assault and Hall, arrived at Hall's vehicle. Detective Robinson testified that he helped complete the search of the vehicle. Inside the trunk, the officers found items associated with the manufacture of

methamphetamine,[3] a complete shotgun, and parts of two other shotguns. The officers found the gun and gun parts inside a zipped-up duffel bag, and found blister packs of pseudoephedrine inside partially-translucent, tied shopping bags. None of the items were found in locked containers. Officers Kasper and Robinson both testified that it was their standard routine to open closed, unlocked containers during an inventory search.

Officer Kasper documented his findings from the inventory search on a CRPD vehicle impounding report. He testified that he also issued a parking ticket, although he acknowledged that there is no record or evidence of the ticket. Officer Kasper also testified that he was unaware that Hall had denied officers' previous requests to search his vehicle.

Based on the evidence from the search of his vehicle, Hall was charged in a four-count indictment. Count One alleged that Hall manufactured and attempted to manufacture five grams or more of methamphetamine after having previously been convicted of a felony drug offense. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846. Count Two alleged that Hall possessed 67.7 grams of pseudoephedrine with the intent to manufacture methamphetamine. 21 U.S.C. § 841(c)(1). Count Three alleged that Hall was a felon in possession of a firearm. 18 U.S.C. §§ 922(g)(1). Finally, Count Four alleged that Hall possessed firearms as an unlawful drug user. 18 U.S.C. §§ 922(g)(3).

Hall moved to suppress the evidence found in his vehicle, arguing that the warrantless search violated the Fourth Amendment. Specifically, Hall argued that the

---

[3]The officers found plastic bottles containing methamphetamine and pseudophedrine residue, coffee filters containing sludge, a gallon pitcher containing sludge, empty glass jars, heavy rubber gloves, a hydrochloric acid generator made with a plastic soda bottle, empty lithium battery containers, camping fuel, an empty paint thinner container, and numerous empty blister packages and boxes for 30 milligram pseudoephedrine tablets.

search was not a valid inventory search because the Policy allowed the searching officers to exercise too much discretion. Following an evidentiary hearing, the magistrate judge recommended the denial of Hall's motion to suppress evidence. The district court adopted the magistrate judge's report and recommendation over Hall's objections and denied Hall's motion to suppress. The court found that the officers did not violate the Fourth Amendment because they followed standard police procedure during their inventory search of Hall's vehicle.

Hall thereafter entered into a conditional plea agreement, pleading guilty to Count One and Count Three of the indictment but reserving his right to appeal the district court's denial of his motion to suppress evidence found in the inventory search of his vehicle. Hall now brings his appeal, arguing that the search was unconstitutional because the Policy left excessive discretion in the hands of the searching officers. He also argues that the officers involved in the search of his vehicle did not comply with the Policy in several respects and that the totality of the circumstances show that the sole motive for the search of his vehicle was investigatory. We address each of Hall's arguments in turn.

II.    Analysis

"When considering the denial of a motion to suppress evidence, we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Le, 474 F.3d 511, 514 (8th Cir. 2007) (quotation omitted). "Police may conduct a warrantless search of a lawfully-impounded vehicle even in the absence of probable cause." United States v. Kennedy, 427 F.3d 1136, 1143 (8th Cir. 2005). The practice of securing and inventorying the contents of vehicles in police custody is a "response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property, and the protection of the police from potential

danger." South Dakota v. Opperman, 428 U.S. 364, 369 (1976) (internal citations omitted).

"The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." Kennedy, 427 F.3d at 1143. Inventory searches that are "conducted according to standardized police procedures" are reasonable. Id. Standardized police procedures are necessary to "ensure that the search is not merely 'a ruse for general rummaging in order to discover incriminating evidence.'" Id. (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

The requirement that officers follow standard procedures in conducting inventory searches does not foreclose the use of some discretion by officers "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375 (1987). "So long as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004). Further, police "may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." United States v. Marshall, 986 F.2d 1171, 1176 (8th Cir. 1993). Even if the officer "suspects he might uncover evidence in a vehicle," the police can still "tow[] a vehicle and inventory[] the contents, as long as the impoundment is otherwise valid." Petty, 367 F.3d at 1013.

A.    Discretion

Hall first contends that the Policy allows officers to perform inventory searches in an unconstitutional manner because it leaves "excessive discretion to the searching officer."  A policy that allows this much discretion, Hall argues, does not satisfy the constitutional requirement of standardized police procedures.  Hall specifically challenges, *inter alia*, the Policy language that allows the inventorying officer to decide whether to treat the case as an in-custody arrest[4] or a private-property tow case.

We find "no indication that the [P]olicy permits officers to perform inventory searches in an unconstitutional manner."  United States v. Beal, 430 F.3d 950, 954 (8th Cir. 2005) (discussing the CRPD policy governing inventory searches).  It is true that the Policy allowed Officer Kasper to exercise some discretion.  Officer Kasper testified at the suppression hearing that he "probably" could have treated the towing of Hall's vehicle as an in-custody arrest, rather than as a private-property tow. Officer Kasper stated that he guessed that decision was within his discretion, "but at the time of [the search he] did not know that [Hall] was currently under arrest."  With one exception, the Policy would have required an inventory search of Hall's vehicle even if Officer Kasper had treated the case as an in-custody arrest.[5]  Therefore, we doubt

_____

[4]The Policy states that: "A vehicle shall be towed in connection with an in custody arrest.  The only exceptions are that the vehicle may be released to another sober, licensed operator in the vehicle at the time of the arrest if the driver/owner so requests, or with commander's approval. . . ."

[5]Hall argues that officers should have asked one of the individuals at the Hospital with Hall to remove his vehicle from the Hospital's parking lot.  Even assuming that Officer Kasper should have treated this case as an in-custody arrest tow, this argument has no merit.  First, there were no people in or around Hall's vehicle when it was being secured.  Second, it is unclear from the record whether either of the two individuals fit the description of a "sober, licensed operator."  One of the individuals was taken to the police station at the same time Hall was.  Also, one of the individuals gave the officers a non driver's identification card, which suggests that he did not have a driver's license.

that the way the case was labeled had any impact. Regardless, "a decision to impound or inventory" does not need to be "made in a 'totally mechanical' fashion." Petty, 367 F.3d at 1012 (quoting Wells, 495 U.S. at 4). Officers are allowed "some latitude and exercise of judgment," as long as "those decisions are based on concerns related to the purposes of an [inventory search]." Id. (quotations omitted). That the Policy allows some discretion as to whether to treat a case as an in-custody arrest tow or a private-property tow does not make the inventory search unconstitutional. Likewise, regarding Hall's other arguments, the minimal discretion afforded searching officers is not constitutionally significant.

B.     Compliance with the Policy/Bad Faith

Hall next argues Officer Kasper violated the Fourth Amendment by conducting the inventory search in bad faith, as evidenced by his failure to comply with the Policy in several respects. See, e.g., United States v. Rowland, 341 F.3d 774, 780 (8th Cir. 2003) (holding that the searching officers "failed to follow [the department's] own procedures" by failing to make a record of all property within the inventoried vehicle). The district court found that the searching officers complied with the Policy in all respects. Hall first urges us to find that the district court's findings of fact regarding Officer Kasper's compliance with the Policy are clearly erroneous. Hall argues that the government was not able to prove that Officer Kasper issued Hall a ticket, as required by the Policy, and that Officer Kasper did not follow Policy instructions regarding closed containers in the vehicle.

Hall's argument fails for two reasons. First, the district court found Officer Kasper credible, and a district court's credibility determinations are "virtually unassailable on appeal." United States v. Watson, 479 F.3d 607, 611 (8th Cir. 2007) (internal quotation omitted). Second, even if we were to determine that the district court's findings of fact are clearly erroneous, the failure to abide by standardized

procedures does not necessarily require the suppression of evidence discovered in Hall's vehicle. "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." Rowland, 341 F.3d at 780 (quoting Marshall, 986 F.2d at 1175). That "something else" is not present here. The Hospital asked Officer Kasper to remove Hall's vehicle. Officer Kasper thus had a legitimate reason to treat the case as a private-property tow, and acted accordingly. Pursuant to the Policy, Officer Kasper called a tow company and conducted an inventory search. In doing so, he completed a CRPD vehicle impounding report, cataloguing both the lawful and incriminating contents of the vehicle. Cf. Id. 341 F.3d at 782 (finding an inventory search invalid when "law enforcement sifted through the vehicle's contents searching only for and recording only incriminating evidence"). Officers Kasper testified that he knew Hall's vehicle was linked to the manufacture of methamphetamine and that the reason officers were securing the vehicle was because of this suspicion. As we stated above, however, provided that the search is conducted according to standard procedures, officers "may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate crime." Marshall, 986 F.2d at 1176. The search here was conducted pursuant to the Policy, and, looking at the totality of the circumstances, we find no evidence that the searching officers acted in bad faith.

III.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____